Filed 12/12/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
  Plaintiff and Respondent, )
)    S176886
v. )
)    Ct.App. 3 C055923
REYNALDO SANTOS DUNGO, )
)    San Joaquin County
  Defendant and Appellant. )   Super. Ct. No. SF100023A
_____ )

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

THE COURT:

  The opinion in this case, filed October 15, 2012, and appearing at 55 Cal.4th 608, is modified as follows:

  1. The third full paragraph of text on page 613 of 55 Cal.4th is modified to read:

  The police arrested defendant, and he eventually admitted killing Pina. He said: After he and Pina left the Torres's home the night of April 14, 2006, they argued at Pina's home. Pina told him to leave and began throwing some of his belongings in a box. She punched defendant lightly on the chin, pushed him, and threw some children's toys at him. He grabbed her by the throat and strangled her. He then wrapped her body in a blanket, put it in her SUV, and drove around aimlessly, eventually abandoning the SUV on the Stockton street where the police later found it.

2.  Footnote 5, at page 620 of 55 Cal.4th, is modified to read:

Defendant contends that even if the statements in nontestifying Dr. Bolduc's autopsy report lacked the requisite formality, the Sixth Amendment's confrontation right also applies to what Justice Thomas called " 'technically informal statements' " if those statements were " 'used to evade the formalized process.' " (*Williams*, *supra*, 567 U.S. at p. ___, fn. 5 [132 S.Ct. at p. 2260, fn. 5] (conc. opn. of Thomas, J.).)  Defendant argues that this exception applies here.  We need not decide the issue, however.  Justice Thomas has made clear, in the language quoted above, that any such exception applies only to the formality requirement for testimonial out-of-court statements.  But formality is not enough to make an extrajudicial statement testimonial; the statement must also have a primary purpose pertaining to the investigation and prosecution of a crime. (*People v. Lopez*, *supra*, 55 Cal.4th 569, 582 ["all nine high court justices agree that an out-of-court statement is testimonial *only* if its primary purpose pertains in some fashion to a criminal prosecution" (italics added)].)  As we will explain (see text discussion, *post*), the autopsy statements upon which Dr. Lawrence relied for his opinions had no such primary purpose.

These modifications do not affect the judgment.

The petition for rehearing is denied.


Corrigan, J., is of the opinion the petition should be granted.

Filed 10/15/12 (unmodified version) (see lead case, S177046, and companion case, S176213, also filed 10/15/12)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)     S176886
    v. )
)     Ct.App. 3 C055923
REYNALDO SANTOS DUNGO, )
)     San Joaquin County
    Defendant and Appellant. )     Super. Ct. No. SF100023A
_____ )

       The Sixth Amendment to the United States Constitution grants a criminal defendant the right to confront adverse witnesses. This is the second in a trio of cases before us involving that right. The two companion cases are *People v. Lopez* (Oct. 15, 2012, S177046) \_\_\_ Cal.4th \_\_\_, and *People v. Rutterschmidt* (Oct. 15, 2012, S176213) \_\_\_ Cal.4th \_\_\_.

       At defendant Reynaldo Santos Dungo's murder trial, a forensic pathologist testifying for the prosecution described to the jury objective facts about the condition of the victim's body as recorded in the autopsy report and accompanying photographs. Based on those facts, the expert gave his independent opinion that the victim had died of strangulation. Neither the autopsy report, which was prepared by another pathologist who did not testify, nor the photographs were introduced into evidence. Unlike the Court of Appeal, we conclude that the expert's testimony did not give rise to a right by defendant to question the preparer of the autopsy report.

1

# I

## A. Facts

Defendant and Lucinda Correia Pina became romantically involved in 2005. Pina lived in Stockton, San Joaquin County, and was in the process of divorcing her husband. Defendant and his daughter also lived in Stockton, but his wife and son were staying with his wife's grandparents in Seaside, Monterey County. Defendant's wife viewed this as a temporary separation, and she talked regularly to defendant, but defendant told Pina that he and his wife were divorced.

In April 2006, defendant's friends noticed that he was exhibiting "controlling behavior" towards Pina. Pina told friends and relatives that defendant was "smothering her" and she wanted to end their relationship. That same month, defendant, while at Pina's house, answered a telephone call to Pina from Isaac Zuniga, who had a prior sexual relationship with Pina; defendant threatened to kill Zuniga if he continued to call Pina. Later, on April 14, Zuniga told Pina about the call. That evening, defendant and Pina went to visit Felipe and Angelique Torres. Pina complained to Angelique that defendant had told Zuniga to stop calling her, and Pina said she was considering raising the issue with defendant.

The next morning, defendant went to see Pina's mother and asked if she knew where Pina was. Defendant said that while he was at Pina's house the previous night, Pina received a telephone call from Zuniga and then left to meet Zuniga. Pina's sport utility vehicle (SUV) was not at her house. Pina's mother then tried repeatedly to reach Pina on her cellphone, without success. That afternoon, the mother called the police.

Local news media reported Pina's disappearance, and they described Pina and her SUV. Thereafter, a Stockton resident told the police that an SUV matching the description was parked on her street. Police officers found Pina's body in the vehicle.

The police arrested defendant, and he eventually admitted killing Pina. He said: After he and Pina left the Torres's home the night of April 14, 2006, they argued at

2

Pina's home. Pina punched defendant lightly on the chin, pushed him, and threw some children's toys at him. She told him to leave and began throwing some of his belongings in a box. He grabbed her by the throat and strangled her. He then wrapped her body in a blanket, put it in her SUV, and drove around aimlessly, eventually abandoning the SUV on the Stockton street where the police later found it.

## B. Trial Court Proceedings

Defendant was charged with Pina's murder. Before trial, the prosecution informed the trial court that pathologist George Bolduc, who had performed the autopsy of Pina's body, would not be called as an expert witness. Instead, the prosecution's witness would be forensic pathologist Robert Lawrence, who at the time of trial was Dr. Bolduc's employer.[1] The prosecution did not indicate that Dr. Bolduc was unavailable to testify. Defendant objected to the prosecution's proposed substitution of its expert witness and asked for an evidentiary hearing on the matter. (See Evid. Code, § 402, subd. (b).) The trial court granted the request.

At the pretrial evidentiary hearing, Dr. Lawrence testified on cross-examination by the defense that Dr. Bolduc had at one point been a coroner in Kern County but "was fired," a fact not disclosed in Bolduc's résumé. Also, in his previous employment as a coroner for Orange County, Dr. Bolduc had resigned "under a cloud."[2] As a result of these incidents, Dr. Lawrence said, some newspaper articles asserted that Dr. Bolduc was

---

[1] At trial, Dr. Lawrence testified to being a pathologist for the San Joaquin County coroner's office and owning Forensic Consultants Medical Group, which provides pathologists, including Dr. Bolduc, to act as coroners in several counties and also offers private consultation.

[2] In *People v. Beeler* (1995) 9 Cal.4th 953, an Orange County capital murder case, Dr. Bolduc performed an autopsy of the murder victim but did not testify at trial. Our opinion affirming the judgment of death mentioned that the trial court in that case "was aware that Dr. Bolduc had apparently left the [Orange County] coroner's office under unfavorable conditions" (*id.* at p. 979), and we noted testimony by a pathologist that Dr. Bolduc had caused " 'quite a bit of consternation' in a prior murder case by basing his conclusion regarding the cause of death on a police report rather than on medical evidence." (*Ibid.*)

incompetent, and prosecutors in several counties in California refused to use him as an expert witness in homicide cases. Dr. Lawrence had seen "no evidence that [Dr. Bolduc] ever did anything incompetent." He said the allegations against Dr. Bolduc were "generated by people who don't know what they're talking about," and he described much of the criticism of Dr. Bolduc as "ridiculous" and "patently absurd." Dr. Lawrence agreed with the conclusion in Dr. Bolduc's autopsy report that Pina died from "asphyxia due to neck compression."

The trial court ruled that at trial the prosecution could have Dr. Lawrence testify about the cause of Pina's death, but that the defense could cross-examine Dr. Lawrence about Dr. Bolduc's qualifications as a pathologist, as this was relevant to the trustworthiness of the facts stated in Dr. Bolduc's autopsy report.

At the jury trial, Dr. Lawrence testified that after reviewing Dr. Bolduc's autopsy report and the accompanying autopsy photographs, he concluded that Pina had died from asphyxia caused by strangulation. He pointed out that Pina had "hemorrhages in the neck organs consistent with fingertips during strangulation" and that she had "pinpoint hemorrhages in her eyes," indicating a lack of oxygen. Also supporting strangulation as the cause of Pina's death, Dr. Lawrence testified, were "the purple color of her face," the "absence of any natural disease that can cause death," and the fact that Pina had bitten her tongue shortly before death. Dr. Lawrence stated that because Pina's hyoid bone was not fractured, Pina was strangled for "more than two minutes." Had a fracture occurred, Dr. Lawrence explained, death could have occurred sooner.

Dr. Lawrence did not describe to the jury Dr. Bolduc's opinion about the cause of Pina's death; instead, he only gave his own independent opinion as a forensic pathologist. Dr. Lawrence did not say whether his description of Pina's body at the time of the autopsy (the hemorrhages in Pina's face and eyes, the purplish color of the face, the bite marks on the tongue, and the absence of a fracture of the hyoid bone) was based solely on the autopsy photographs, solely on Dr. Bolduc's autopsy report, or on a combination of

4

them. Neither the autopsy photographs nor Dr. Bolduc's autopsy report was admitted into evidence.[3] On cross-examination, defense counsel questioned Dr. Lawrence regarding his views about the cause of Pina's death, but not about Dr. Bolduc's qualifications.

Testifying on his own behalf, defendant said that on the night he killed Pina, he told her of his suspicion that she might be resuming her relationship with Isaac Zuniga. Defendant and Pina began swearing at each other, and Pina told defendant: "I'll fuck whoever I want. . . . [i]f I want to fuck Isaac, if I want to fuck Anul [Pina's husband], I will do whatever I want." Defendant grabbed Pina's arm, after which Pina punched him on the chin and bit his arm, saying: "You're not even a good father. You're a lousy fucking father . . . you're a worthless piece of shit." Defendant "snapped." He grabbed Pina's neck and strangled her, saying: "Fuck you, Lucinda. I'm a good dad. I'm a good dad. I'm not a bad father. Fuck you."

In closing argument, defense counsel conceded defendant's killing of Pina but argued that the murder was without malice as it occurred in a sudden quarrel or heat of passion, and that therefore defendant was guilty only of voluntary manslaughter, not murder.[4] The prosecutor, citing Dr. Lawrence's testimony that Pina was strangled for "more than two minutes," argued that defendant could not have been acting in the heat of passion for that length of time, and that therefore the killing was murder rather than manslaughter.

---

[3] We grant the district attorney's motion, which defendant does not oppose, that we take judicial notice of the autopsy report. (See *People v. Castillo* (2010) 49 Cal.4th 145, 157 [a court may take judicial notice of a public record when it does not consider the record for the truth of matters stated therein]; *Dixon v. Superior Court* (2010) 170 Cal.App.4th 1271, 1278 [an autopsy report is a public record].)

[4] "Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) When an unlawful killing occurs "upon a sudden quarrel or heat of passion" (Pen. Code, § 192, subd. (a)) the killer lacks malice, and the crime is voluntary manslaughter, a lesser offense necessarily included within the crime of murder. (See *People v. Moye* (2009) 47 Cal.4th 537, 549.)

5

## C. *Verdict and Appeal*

The jury convicted defendant of second degree murder, and the trial court sentenced him to a prison term of 15 years to life.

The Court of Appeal reversed the judgment. It concluded that Dr. Lawrence's trial testimony about the cause of Pina's death violated defendant's federal Sixth Amendment right to confront and cross-examine Dr. Bolduc, and that the error was prejudicial. We granted the district attorney's petition for review.

## II

Like the two companion cases, this case presents a Sixth Amendment confrontation right issue with complexities that are far from easy to resolve in light of the widely divergent views expressed by the justices of the United States Supreme Court in a recent quartet of cases we must consider here. Those cases are: (1) *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), a seven-to-two decision; (2) *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), a five-to-four decision; (3) *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705] (*Bullcoming*), a five-to-four decision; and (4) *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*), a four-one-four decision.

Well before *Crawford*, the high court had, in *Ohio v. Roberts* (1980) 448 U.S. 56, 66, construed the federal Constitution's confrontation right as allowing the use at trial of any out-of-court statements that were within a "firmly rooted hearsay exception" or had "particularized guarantees of trustworthiness." But some 25 years later, in *Crawford*, the high court abandoned that approach and adopted this general rule: The prosecution may not use "[t]estimonial statements" of a witness who does not appear at trial, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Crawford*, *supra*, 541 U.S. at p. 59.)

The *Crawford* majority explained that the Sixth Amendment's confrontation right pertains to those who give "testimony," defined as " '[a] solemn declaration or

affirmation made for the purpose of establishing or proving some fact.' " (*Crawford*, *supra*, 541 U.S. at p. 51.) *Crawford* mentioned several *possible* definitions, by several sources, of statements that are testimonial in nature, including " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . .' [citation]." (*Id.* at pp. 51-52.) But *Crawford* did not adopt a particular definition, noting only that "some statements qualify under any definition." (*Id.* at p. 52.)

Five years later, in 2009, came the high court's decision in *Melendez-Diaz*, which extended *Crawford*'s holding to forensic reports. There, at the defendant's trial for cocaine distribution and trafficking, the prosecution introduced into evidence a laboratory's "certificates of analysis": sworn statements that a substance found in plastic bags in the defendant's car was determined to be cocaine. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 308.) The high court held that the laboratory certificates were "within the 'core class of testimonial statements,' " making them inadmissible under the reasoning of *Crawford*, *supra*, 541 U.S. 36. (*Melendez-Diaz*, *supra*, at p. 310.) The *Melendez-Diaz* majority explained: Each certificate was (1) "a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact" ' " (*ibid.*), (2) "functionally identical to live, in-court testimony" (*id*. at pp. 310-311), (3) " 'made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial' " (*id*. at p. 311), and (4) created "to provide 'prima facie evidence of the composition, quality, and the net weight' " (*ibid*.) of the substance found in the plastic bags seized from the defendant's car.

Two years later, in 2011, the high court decided *Bullcoming*, which involved a charge of driving while intoxicated. At trial, the prosecution introduced into evidence a report by laboratory analyst Curtis Caylor. The report included Caylor's "certificate of

7

analyst" (*Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2710]) stating the correctness of his report's conclusion that a blood sample taken at the defendant's arrest had an illegally high level of alcohol. Caylor did not testify. Instead, the prosecution called as a witness a colleague of Caylor's — an analyst who, although familiar with the laboratory's testing procedures, had neither participated in nor observed the testing by Caylor. The high court held that the admission at trial of Caylor's laboratory report violated the defendant's right to confront and cross-examine Caylor. The court noted that unlike the laboratory certificates in *Melendez-Diaz*, *supra*, 557 U.S. 305, which were statements sworn before a notary public attesting to the truth of the reported test results, Caylor's certificate was not a sworn declaration. Nevertheless, the high court pointed out, "Caylor's certificate [was] 'formalized' in a signed document" (*Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717]) — the laboratory report — and the report made reference to New Mexico court rules that "provide for the admission of certified blood-alcohol analyses" (*ibid*.). These "formalities" (*ibid*.) the high court concluded, were "more than adequate" (*ibid*.) to qualify Caylor's laboratory report as testimonial in nature.

In June of this year, 12 days after we heard oral argument in this matter and while it was pending before us, the high court decided *Williams*, *supra*, 567 U.S. ___ [132 S.Ct. 2221]. At issue in *Williams* was testimony by Illinois State Police forensic biologist Sandra Lambatos that a DNA profile (derived from semen on vaginal swabs taken from a rape victim) produced by a Maryland laboratory matched a DNA profile (derived from a sample of the defendant's blood) produced by the Illinois State Police Laboratory.

The plurality opinion in *Williams*, authored by Justice Alito, was signed by the Chief Justice as well as Justices Kennedy and Breyer; in a separate concurring opinion Justice Breyer explained why he joined Justice Alito's opinion "in full" (*Williams*, *supra*, 567 U.S. at p. ___ [132 U.S. 2221, 2252] (conc. opn. of Breyer, J.)). The plurality concluded on two alternative grounds that Lambatos's expert testimony did not violate

8

the federal Constitution's confrontation right. First, the plurality reasoned that Lambatos's testimony was constitutionally permissible because it was admitted not for its truth but only for the limited purpose of explaining the basis of Lambatos's independent conclusion, based on her expertise, that the defendant's DNA matched the DNA in the semen found on the vaginal swabs. (*Id.* at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Alternatively, the *Williams* plurality reasoned, there was no confrontation right violation because the Maryland laboratory's report was prepared for the primary purpose of finding a dangerous rapist who was still at large, not "for the primary purpose of accusing a targeted individual." (*Id.* at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) In a separate concurring opinion, Justice Thomas agreed with the plurality's conclusion that Lambatos's expert testimony did not offend the Sixth Amendment's confrontation right, but for a completely different reason: The Maryland laboratory report on which Lambatos relied "lack[ed] the solemnity of an affidavit or deposition" and was therefore not "testimonial." (*Id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).) A dissenting opinion by Justice Kagan, and signed by Justices Scalia, Ginsburg, and Sotomayor, disagreed with the reasoning of both the plurality and Justice Thomas, and concluded that Lambatos's testimony violated the defendant's confrontation right. These widely divergent views, none of which was able to garner majority support — as reflected in the four-one-four decision — highlight the complexity of the issue.

## III

We noted earlier that at defendant's murder trial, Dr. Lawrence gave his independent opinion as to the cause of Pina's death. Dr. Lawrence reached that opinion after reviewing an autopsy report (with accompanying photographs) prepared by Dr. Bolduc, who did not testify and thus could not be confronted by defendant. The Court of Appeal concluded that Dr. Lawrence's testimony violated defendant's right to confront and cross-examine Dr. Bolduc.

9

Limiting our inquiry are two significant points. First, here (unlike in the companion case of *People v. Lopez, supra*, __ Cal.4th ___), Dr. Bolduc's autopsy report was not introduced into evidence. Thus, we need not decide whether that entire report is testimonial in nature. Second, Dr. Lawrence's testimony never described the conclusions in Dr. Bolduc's autopsy report as to the cause of Pina's death. Thus, we need not determine whether such testimony, if it had been given, would have violated defendant's right to confront Dr. Bolduc.

Dr. Lawrence did, however, describe to the jury the condition of Pina's body at the time of the autopsy: the hemorrhages in Pina's eyes and neck organs, the purple color of her face, the absence of any natural disease causing death, the fact that she had bitten her tongue shortly before death, and the absence of any fracture of the hyoid bone. This description was based on Dr. Lawrence's review of Dr. Bolduc's autopsy report and its accompanying photographs. (As we have noted earlier (see p. 5, *ante*), the record before us does not indicate whether Dr. Lawrence based his description solely on the autopsy photographs, solely on Dr. Bolduc's autopsy report, or on a combination of the two.) The issue before us is whether Dr. Lawrence's testimony about these objective facts entitled defendant to confront and cross-examine Dr. Bolduc.

As we discussed in the companion case of *People v. Lopez, supra*, __ Cal.4th at page ___ [p. 13], the prosecution's use of testimonial out-of-court statements "ordinarily violates the defendant's right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." Although the high court has not agreed on a definition of "testimonial," testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution. The high court justices have not, however, agreed on what the statement's primary purpose must be.

We begin with the issue of formality. An autopsy report typically contains two types of statements: (1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death. The out-of-court statements at issue here — pathologist Bolduc's observations about the condition of victim Pina's body — all fall into the first of the two categories. These statements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature. (*Melendez-Diaz*, *supra*, 557 U.S. at p. 312, fn. 2 ["medical reports created for treatment purposes . . . would not be testimonial under our decision today"].)[5]

Defendant argues that the statements in nontestifying Dr. Bolduc's autopsy report were sufficiently "formal" because: (1) a detective was present when the autopsy of Pina was performed, (2) the autopsy was statutorily mandated, (3) Dr. Bolduc was required by statute to report his findings, (4) Detective Fain disclosed defendant's confession to Dr. Bolduc before the autopsy report was written, and (5) Dr. Bolduc was statutorily required to notify law enforcement if he determined that there were reasonable grounds to suspect that the death was a homicide. But those circumstances have little to do with the *formality and solemnity* of the statements. Rather, they pertain to the second of the two categories mentioned above: the *primary purpose* of the statements in the report.

---

[5] Defendant contends that even if the statements in nontestifying Dr. Bolduc's autopsy report lacked the requisite formality, the Sixth Amendment's confrontation right also applies to what Justice Thomas called " 'technically informal statements' " if those statements were " 'used to evade the formalized process.' " (*Williams*, *supra*, 567 U.S. at p. ___, fn. 5 [132 S.Ct. at p. 2260, fn. 5] (conc. opn. of Thomas, J.).) Defendant argues that this exception applies here. But he did not raise this argument at trial, and therefore the trial court did not determine whether the statements at issue here were " 'used to evade the formalized process.' " (*Ibid.*) Thus, this argument can only be made, if at all, in a habeas corpus petition.

11

For example, the presence of a detective at the autopsy and the fact that the detective told the pathologist about defendant's confession do not make the statements of objective fact in the autopsy report into formal and solemn testimony; but those circumstances do support defendant's argument that the primary purpose of the autopsy was the investigation of a crime. Similarly, the fact that the autopsy was mandated by a statute that required public findings and notification of law enforcement does not imply that the statements of objective fact in the report are formal and solemn testimony, but it does imply that the primary purpose of the autopsy was forensic. Therefore, we turn now to the question of primary purpose.

The preparation of an autopsy report is governed by California's Government Code section 27491, which requires a county coroner to "inquire into and determine the circumstances, manner, and cause" of certain types of death. Some of these deaths (such as deaths from alcoholism, "sudden infant death syndrome," and "contagious disease") result from causes unrelated to criminal activities, while other deaths (such as deaths resulting from "criminal abortion," deaths by "known or suspected homicide," and "deaths associated with a known or alleged rape") result from the commission of a crime. (*Ibid.*) With respect to all of the statutorily specified categories of death, however, the scope of the coroner's statutory duty to investigate is the same, regardless of whether the death resulted from criminal activity.

The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes. For example, the decedent's relatives may use an autopsy report in determining whether to file an action for wrongful death. And an insurance company may use an autopsy report in determining whether a particular death is covered by one of its policies. (See, e.g., *People v. Rutterschmidt, supra*, ___ Cal.4th ___.) Also, in certain cases an autopsy report may satisfy the public's interest in knowing the cause of death,

12

particularly when (as here) the death was reported in the local media. In addition, an autopsy report may provide answers to grieving family members.

In short, criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of Pina's body; it was only one of several purposes. The presence of a detective at the autopsy and the statutory requirement that suspicious findings be reported to law enforcement do not change that conclusion. The autopsy continued to serve several purposes, only one of which was criminal investigation. The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial. (*Melendez-Diaz*, *supra*, 554 U.S. at p. 324.)

In summary, Dr. Lawrence's description to the jury of objective facts about the condition of victim Pina's body, facts he derived from Dr. Bolduc's autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine Dr. Bolduc. The facts that Dr. Lawrence related to the jury were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question. In holding that defendant's confrontation right was violated here, the Court of Appeal erred.

13

## Disposition

The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with this opinion.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.

14

**CONCURRING OPINION BY WERDEGAR, J.**


I concur in the reasoning and result of the majority opinion, which I have signed. I write separately to explain in more detail why the anatomical and physiological observations recorded by a forensic pathologist in an autopsy report should not be considered testimonial, as that term has been used in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny.

As the majority explains (maj. opn., *ante*, at p. 11), the autopsy report by Dr. George Bolduc, who conducted the autopsy but did not testify at trial, was not admitted into evidence; the question of whether the autopsy report itself was testimonial is thus not before us. In addition, the testifying pathologist, Dr. Robert Lawrence, gave his own expert opinions as to the cause and manner of death rather than relaying those reached by Dr. Bolduc; hence, the question of whether such recorded conclusions are testimonial is also not before us. Like the majority, therefore, I focus exclusively on Dr. Lawrence's repetition to the jury of anatomical and physiological observations Dr. Bolduc recorded in his report, upon which Dr. Lawrence based his conclusions. Of these, the most significant was Dr. Bolduc's recorded observation that the victim's larynx and hyoid bone were both unbroken, from which Dr. Lawrence concluded the victim was strangled for "a period of minutes . . . certainly more than two minutes."[1] Dr. Lawrence's opinion

---

[1] Dr. Lawrence's reasoning was that in the absence of a fracture that might have blocked the victim's airway, it was "unlikely that she was just briefly

1

became, in turn, the basis for prosecutorial argument to the jury that the killing was intentional and premeditated.

The question of what out-of-court statements are and are not testimonial has divided the justices of the United States Supreme Court, whose decisions have not yet yielded a clear definition or test. But the justices have consistently considered two factors in deciding whether a given statement sufficiently resembles the English court abuses that gave rise to the confrontation clause, primarily the use at trial of witness statements obtained through ex parte examination: (1) the degree of formality or solemnity with which the statement was made and (2) the degree to which it was produced for use at trial. The more a statement resembles the " 'solemn declaration or affirmation' " that is testimony, commonly understood, and the more it was expected, when made, " 'to be used prosecutorially' . . . 'at a later trial,' " the more centrally it is located within the "core class of 'testimonial' statements." (*Crawford*, *supra*, 541 U.S. at pp. 51-52.)

Throughout the high court's exploration of the issue, Justice Thomas has maintained that solemnity or formality is the sine qua non of the testimonial statement. This focus is demonstrated in his separate opinions in *Davis v. Washington* (2006) 547 U.S. 813, 838 (*Davis*) and *Michigan v. Bryant* (2011) 562 U.S. ___, ___ [131 S.Ct. 1143, 1167] (*Bryant*), both asserting that statements resulting from a witness's informal conversation with police officers are not testimonial, in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 330 (*Melendez-Diaz*), where Justice Thomas concurred with the majority that certificates of chemical content were affidavits and hence testimonial, and in *Williams v. Illinois* (2012) 567 U.S. ___, ___, ___ [132 S.Ct. 2221, 2255] (*Williams*), where he argued a DNA profile report was not testimonial because it

---

squeezed and then let go and went on to die. I think there was pressure applied for a longer period."

lacked solemnity and formality (*id.* at p. 2260). Other opinions, primarily majority opinions, have relied on this factor as well. (See *Crawford*, *supra*, 541 U.S. at p. 53, fn. 4 [witness's "recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition" of interrogation, and was hence testimonial]; *Davis*, *supra*, 547 U.S. at p. 830 [though not so formal as in *Crawford*, police questioning was "formal enough"]; *Melendez-Diaz*, *supra*, 557 U.S. at p. 310 [certificates of chemical content "are incontrovertibly a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact" ' "]; *Bullcoming v. New Mexico* (2011) 564 U.S. ___, ___ [131 S.Ct. 2705, 2717] (*Bullcoming*) [though not sworn before a notary public, certificates were "[l]ike the *Melendez-Diaz* certificates . . . 'formalized' in a signed document"]; *Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2242] (plur. opn. of Alito, J.) [testimonial hearsay typically consists of "formalized statements such as affidavits, depositions, prior testimony, or confessions"].)

The critical hearsay statement in this case—Dr. Bolduc's recorded observation that the victim's larynx and hyoid bone were unbroken—lacked the solemnity and formality that characterize statements the high court deems testimonial. Although Dr. Bolduc signed and dated his autopsy report, it was not sworn or certified in a manner comparable to the chemical analyses in *Melendez-Diaz* and *Bullcoming*. The report contrasts in this respect with the coroner's or attending physician's "[c]ertification and signature" on a death certificate, by which the declarant "attest[s] to [the] accuracy" of "the portion of the certificate setting forth the cause of death." (Health & Saf. Code, § 102875, subd. (a)(7).) Though the cause of death declared on a death certificate is to be "in conformity with" the "facts ascertained" by autopsy or other investigation (Gov. Code, § 27491.5), the two documents, autopsy report and death certificate, are distinct,

3

and only the latter bears a formal certification mandated by statute. Certainly, no certification or solemn attestation accompanied the portions of Dr. Bolduc's autopsy report containing his observations as to the unbroken state of the decedent's larynx and hyoid bone.

In cases involving the declarations of percipient witnesses rather than laboratory reports, the high court has looked to the degree of formality and structure of the *circumstances* in which the statement was made, using this analysis to help determine whether the statement is akin to the products of ex parte examinations. (See *Crawford*, *supra*, 541 U.S. at pp. 50-53 & fn. 4 [contrasting nontestimonial "off-hand, overheard" remarks with the testimonial products of "structured" police interrogation]; *Davis*, *supra*, 547 U.S. at p. 830 [as in *Crawford*, formal police interrogation of witness bore a " 'striking resemblance' " to ex parte examinations]; *Bryant*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1155] [where "state actors are involved in formal, out-of-court interrogation of a witness to obtain evidence for trial," resulting statements are considered testimonial].) Looking beyond the question of certification to the formality or lack thereof in the circumstances in which Dr. Bolduc's anatomical observations were made and recorded, the statements again appear to lack the requisite formality.

As the majority observes, autopsy reports typically (and in this case) have two parts: "(1) the objective forensic autopsy with its findings including toxicological tests, special tests, microscopic examination, etc., and (2) the interpretations of the forensic pathologist including cause and manner of death." (Nat. Assn. of Medical Examiners, Forensic Autopsy Performance Standards (2005, as amended, Aug. 11, 2011) std. H31, p. 25 (hereafter NAME Standards); see maj. opn., *ante*, at p. 12.) Whatever one might say of the latter portion (again, that issue is not before us here because Dr. Lawrence testified to his own conclusions as to cause and manner of death, not to Dr. Bolduc's), the former does

4

not resemble the ex parte examinations of historical example or the structured police interrogations of *Crawford* and *Davis*. Though there is a structure to the autopsy examination process, it is largely that of a medical examination, not an interrogation. "Performance of a forensic autopsy is the practice of medicine." (NAME Standards, *supra*, std. B4, p. 10.) A professionally prepared autopsy report should record the pathologist's observations of the external examination and, where performed, the internal examination of the decedent's body, with a description of all internal and external injuries observed "in sufficient detail to support diagnoses, opinions, and conclusions." (*Id.*, std. H31.8, p. 25.) The process of systematically examining the decedent's body and recording the resulting observations is thus one governed primarily by *medical* standards rather than by legal requirements of formality or solemnity.

On the second factor going to a statement's testimonial character, the primary purpose behind the statement's production, a consensus appears to exist that a statement is more testimonial to the extent it was produced under circumstances making it likely to be used in place of live testimony at a future criminal trial. (See *Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.) ["the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial"]; *id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.) [court has asked "whether a statement was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence"]; *Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717] ["A document created solely for an 'evidentiary purpose' . . . made in aid of a police investigation, ranks as testimonial."]; *Bryant*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1155] [confrontation clause not implicated when "a statement is not procured with a primary purpose of creating an out-of-court substitute for trial

testimony"]; *Melendez-Diaz*, *supra*, 557 U.S. at p. 311 [observing that "under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance"]; *Davis*, *supra*, 547 U.S. at p. 830 [statements made under formal police interrogation are "an obvious substitute for live testimony"].)

Assessing the degree to which Dr. Bolduc's observations on the state of the victim's larynx and hyoid bone were produced for use at trial, I conclude the nontestimonial aspects of these anatomical observations predominate over the testimonial. A California coroner or medical examiner[2] has, by statute, the duty of investigating certain categories of deaths, regardless of whether the death is also the subject of a criminal investigation. (Gov. Code, § 27491; see maj. opn., *ante*, at p. 13.) Speaking generally, the coroner or medical examiner investigates a death "cooperatively with, but independent from, law enforcement and prosecutors" with the goal of producing a "neutral and objective medical assessment of the cause and manner of death." (NAME Standards, *supra*, std. A1, p. 7.) The investigation of deaths through autopsies in appropriate cases "protects the public interest and provides the information necessary to address legal, public health, and public safety issues in each case." (*Id.*, std. B3, p. 9.)

To be sure, an autopsy physician documents his or her observations of the decedent's injuries partly "to provide evidence for court," but detailed documentation of the pathologist's observations is also important "to support or refute interpretations" and "to serve as a record." (NAME Standards, *supra*, std. E13, p. 15.) A competent autopsy physician describes the decedent's observed injuries and condition as a matter of course; an autopsy report that lacked such

---

[2] A California county may choose to employ an appointed medical examiner in place of a coroner. In such a county, the medical examiner exercises the statutory powers and duties of the coroner. (Gov. Code, § 24010.)

6

documentation would not meet minimum professional standards. (*Id.*, §§ D-F, pp. 13-21.) That Dr. Bolduc reported his findings concerning the condition of the victim's larynx and hyoid bone primarily for use as trial evidence is doubtful.

A statement should also be deemed more testimonial to the extent it was produced through the agency of government officers engaged in a prosecutorial effort, and less testimonial to the extent it was produced for purposes other than prosecution or without the involvement of police or prosecutors. "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar." (*Crawford*, *supra*, 541 U.S. at p. 56, fn. 7.) The high court has made clear a witness's statement may be testimonial even if it does not *by itself* inculpate the defendant (*Melendez-Diaz*, *supra*, 557 U.S. at pp. 313-314), and a majority of the justices have rejected a very narrow definition of testimonial statements as limited to those "prepared for the primary purpose of accusing a targeted individual" (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.); see *id*. at p. ___ [132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.); *id*. at pp. ___-___ [132 S.Ct. at pp. 2273-2274 (dis. opn. of Kagan, J.)). Nonetheless, the court's *Crawford* jurisprudence suggests that testimonial character depends, to some extent, on the degree to which the statement was produced by or at the behest of government agents for use in a criminal prosecution.

As the court explained in *Bryant*, certain types of hearsay are considered nontestimonial because, having been produced primarily for purposes other than use in a criminal trial, they pose a significantly reduced "prospect of fabrication." (*Bryant*, *supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1157].) Among these are business and public records " 'created for the administration of an entity's affairs.' " (*Id.* at p. ___, fn. 9 [131 S.Ct. at p. 1157, fn. 9].) In contrast, when law

7

enforcement agents solicit statements from witnesses for the purpose of using those statements against a person, the prospect for fabrication is at its greatest. Even without telling a witness what to say, government agents intent on building a criminal case against a suspect may consciously or unconsciously bias a witness's responses by verbal and nonverbal cues. It is the accusatory context that makes the production of such out-of-court testimony especially dangerous and demands the resulting statements be considered "testimonial under even a narrow standard." (*Crawford*, *supra*, 541 U.S. at p. 52; see also *id.* at p. 53 ["The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace."].) A process in which government agents may prompt a witness to make inherently inculpatory statements is more dangerous, and should more readily lead to classification of the statements as testimonial, than one in which a witness acts independently to record observations made as a regular part of the witness's business or profession, even if those observations turn out to be helpful to the prosecution in a particular case.

Focusing once more on Dr. Bolduc's recorded observations on the decedent's injuries, in particular the observation that her larynx and hyoid bone were unbroken, it does not appear Dr. Bolduc's record of that observation was produced through a prosecutorial effort to obtain evidence against defendant, or anyone else, for use at trial. As previously discussed, a medical examiner's duty to investigate the victim's death is independent of any police inquiry or prosecutorial effort. (See *U.S. v. Feliz* (2d Cir. 2006) 467 F.3d 227, 237 [relying on medical examiner's independent statutory duty "to conduct autopsies in various situations" to show autopsy report was nontestimonial public record].) While a police detective was apparently present at the autopsy, there is no evidence he asked Dr. Bolduc to investigate possible breaks in the victim's larynx or hyoid bone, or to answer any other particular question about the condition of the

8

decedent's body. As a matter of standard practice, a competent autopsy physician will describe and document possible blunt force injuries to skeletal and other structures. (NAME Standards, *supra*, std. F24, p. 21.) The record does not show or suggest that Dr. Bolduc was prompted by prosecutorial agents to make any of the statements at issue, or indeed that he was guided in his conduct and documentation of the autopsy by anything other than professional medical practices and standards.

For the above reasons as well as those given by the majority, I conclude the trial court did not err in admitting Dr. Lawrence's testimony over a confrontation clause objection. Dr. Lawrence relayed to the jury certain physical observations recorded by Dr. Bolduc in his report of the autopsy, using those observations to support Dr. Lawrence's own expert opinions as to the cause and manner of death. Dr. Bolduc's observations were introduced for their truth, and since Dr. Bolduc was not shown to be unavailable and had not been subject to prior cross-examination on this matter by defendant, his statements, were they testimonial, would have been inadmissible under *Crawford*. But because they neither bore sufficient indicia of formality or solemnity nor were produced primarily for use instead of live evidence at a criminal trial, they were not testimonial, and the confrontation clause did not bar their use. We need not decide here—and the majority does not decide—whether an autopsy report itself, or the examining pathologist's conclusions as to cause and manner of death, would be similarly admissible without the testimony of the examining pathologist.

**WERDEGAR, J.**

WE CONCUR:

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**

9

**CONCURRING OPINION BY CHIN, J.**


I concur fully in the majority opinion, which I have signed. I write separately to explain why Dr. Lawrence's testimony did not violate defendant's federal confrontation rights under the United States Supreme Court's recent decision in *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221] (*Williams*).

Unfortunately, as the majority opinion explains (maj. opn., *ante*, at pp. 9-10), the high court had a majority for its result in *Williams*, but there was no majority explanation for this result. It took a combination of two opinions — each containing quite different reasoning — to achieve the majority result: (1) the plurality opinion authored by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, and (2) Justice Thomas's opinion concurring in the judgment. Neither the plurality's nor Justice Thomas's reasoning gained majority support. Indeed, a majority of the court (Justice Thomas and the four dissenters) disagreed with the plurality's reasoning. (See *People v. Lopez* (Oct. 15, 2012, S177046) __ Cal.4th __ [maj. opn., pp. 9-12].) This situation makes it difficult to determine what to make of that decision.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .' " (*Marks v. United States* (1977) 430 U.S. 188, 193.) This rule does not work particularly well, if at all, unless "one opinion can be meaningfully regarded as 'narrower' than another," that is, unless

1

"one opinion is a logical subset of other, broader opinions." (*King v. Palmer* (D.C. Cir. 1991) 950 F.2d 771, 781 (in bank).) Here, neither the plurality opinion nor Justice Thomas's concurring opinion can be viewed as a logical subset of the other. Indeed, to some extent they are contradictory. One court has said that "[w]hen it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." (*U.S. v. Alcan Aluminum Corp.* (2d Cir. 2003) 315 F.3d 179, 189.) Is that the situation here? Are we to discern no law of the land from the *Williams* case? I do not believe so. We *can* discover the narrowest ground for a decision. We *can* discover a standard that commands majority support.

We know what the *result* was in *Williams*, *supra*, 567 U.S. __ [132 S.Ct. 2221]: The testimony at issue did not violate the confrontation clause. This is because a majority of the court so concluded. Four justices (the plurality) found no violation for their reasons. One justice (Justice Thomas) found no violation for his different reasons. This means that a majority of the *Williams* court would find no violation of the confrontation clause whenever there was no violation under the plurality's *and* under Justice Thomas's reasoning. This is exactly what happened in *Williams* itself. "We need not find a legal opinion which a majority joined, but merely 'a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree.' " (*U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157 [unrelated opn.].) If there is no confrontation clause violation under both the plurality and Justice Thomas's opinion, a majority of the high court's *Williams* case would agree with the result — no confrontation clause violation. To adapt the Ninth Circuit's analysis to this case, "we must identify and apply a test which satisfies the requirements of

2

both Justice [Alito's] plurality opinion and Justice [Thomas's] concurrence."
(*U.S. v. Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 1157.)

Accordingly, we must determine whether there was a confrontation clause violation under Justice Thomas's opinion *and* whether there was a confrontation clause violation under the plurality's opinion. If there was no violation under both opinions, then the result (finding no confrontation clause violation) would command the support of a majority from the high court's *Williams* case. Such a test satisfies the requirements of both the plurality opinion and Justice Thomas's concurrence.

Justice Thomas would find no violation if the out-of-court statements lack the necessary formality and solemnity to be testimonial. (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2255] (conc. opn. of Thomas J.).) As the majority in this case explains, the statements here are not sufficiently formal to meet this test. (Maj. opn., *ante*, at pp. 12-13.)

The *Williams* plurality opinion stated two reasons for its finding of no confrontation clause violation. The second reason applies here. In the introductory portion of its opinion, the plurality summarized this second reason: "The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) (All further citations to *Williams* will be to the plurality opinion unless otherwise indicated.)

3

Later, the plurality explained its reasoning in greater detail. It said that the "abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the *primary purpose of accusing a targeted individual of engaging in criminal conduct* and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2242], italics added.)

The *Williams* plurality cites cases involving reports that *did* have the purpose of accusing a targeted person of a crime, such as a report having the purpose of showing the "defendant's blood-alcohol level exceeded legal limit" or that a "substance connected to [the] defendant contained cocaine." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2242].) But, the plurality said, the report in its case "is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual. In identifying the primary purpose of an out-of-court statement, we apply an objective test. [Citation.] We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account *all of the surrounding circumstances*. [Citation.]

"Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the [Illinois State Police] lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner — or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a

4

scientifically sound and reliable profile.  [Citation.]"  (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at pp. 2243-2244], italics added.)

The plurality continued:  "When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be.  In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed.  But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation.  The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating — or both."  (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2244].)

The out-of-court statements in the autopsy report that Dr. Lawrence relied on to form his opinion are not testimonial under this test.  They did not have the primary purpose of accusing defendant or any other targeted individual of engaging in criminal conduct.  The primary purpose of the portions of the report that Dr. Lawrence relied on was to describe the condition of the body.  (See also maj. opn., *ante*, at pp. 13-14; conc. opn. of Werdegar, J., *ante*, at pp. 4-5.)  In describing the condition of the body, there was no prospect of fabrication or incentive to produce anything other than a scientifically reliable report.  The purpose of this part of the autopsy report is "simply to perform [the pathologist's] task in accordance with accepted procedures."  (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2244].)

The plurality opinion in *Williams* indicates that practical considerations helped inform its conclusion.  "If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable.

5

[Citation.]  The Confrontation Clause does not mandate such an undesirable development." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2228].)

Similar practical considerations support finding that autopsy reports, or at least the objective, factual observations included in those reports, are not testimonial for these purposes.  A holding that everything in autopsy reports is testimonial — and, accordingly, that only the pathologist who prepared the report may testify about it — would have serious adverse consequences.  "Years may pass between the performance of the autopsy and the apprehension of the perpetrator.  This passage of time can easily lead to the unavailability of the examiner who prepared the autopsy report.  Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report.  Unlike other forensic tests, an autopsy cannot be replicated by another pathologist.  Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case." (*People v. Durio* (N.Y.Sup.Ct. 2005) 794 N.Y.S.2d 863, 869.)  Much harm would be done to the criminal justice system, with little accompanying benefit to criminal defendants, if all reliance on autopsy reports were banned.

Justice Breyer discussed the practical considerations concerning autopsy reports in a separate concurring opinion in *Williams*.  "[T]o bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial.  Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports. Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial.  Autopsies are typically

6

conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? [Citations.] Is the Confrontation Clause ' "effectively" ' to function ' "as a statute of limitations for murder" '? [Citation.]" (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2251] (conc. opn. of Breyer, J.).) Justice Breyer spoke only for himself, but his observations are entirely consistent with the plurality opinion that he joined.

Some of the attendant circumstances in this case support the argument that the autopsy report was prepared with the primary purpose of accusing defendant of a crime. Unlike the situation in *Williams*, defendant was a suspect at the time the autopsy report was prepared. An investigator was present during the autopsy, and the pathologist had been told of defendant's confession before the autopsy report was written. Although the plurality in *Williams* stated that the defendant in that case happened not to be a suspect or in custody at the time the report was prepared, nothing in its opinion suggests this is a *requirement* rather than merely one of the "surrounding circumstances" of which the court must take account. (*Williams*, *supra*, 567 U.S. at p. __ [132 at p. 2243].) Because of these circumstances, a statement in the autopsy report expressing the opinion, for example, that the victim had been strangled for two minutes might have been prepared with the primary purpose of accusing a targeted individual. But here, Dr. Lawrence, *the testifying witness*, offered that opinion. Defendant had full opportunity to confront and cross-examine Dr. Lawrence regarding that opinion.

The autopsy report itself was not introduced into evidence. Rather, in forming his opinion, Dr. Lawrence merely relied on information regarding the condition of the body that was detailed in that report, such as that the victim's larynx and hyoid bone had not been fractured. But these statements are objective observations of the type routinely placed into autopsy reports, whether or not a

specific suspect exists.  They are not statements with a primary purpose of accusing defendant, or anyone else, of criminal conduct.  The fact that the larynx and hyoid bone were not broken, like most of the other observations memorialized in the report, "was not inherently inculpatory."  (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2228].)  There was no prospect of fabrication or incentive to produce anything other than an accurate description of the state of the body.  (*Id.* at p.__ [132 S.Ct. at p. 2244].)

The trial court did not have to allow defendant to confront Dr. Bolduc, the pathologist who prepared the autopsy report, regarding his observations, including that the larynx and hyoid bone were not broken.  Indeed, such confrontation would undoubtedly have been futile.  It seems unlikely a pathologist who conducts many autopsies would specifically remember a detail such as that.  If called to testify, Dr. Bolduc, like Dr. Lawrence, would undoubtedly have had to rely on the report, rather than his memory, in this regard.  (See *People v. Durio*, *supra*, 794 N.Y.S.2d at p. 869, quoted *ante*.)  That is one of the purposes for preparing and preserving written autopsy reports.

For these reasons, I conclude the *Williams* plurality would find no confrontation clause violation in this case.  Because Justice Thomas would also find no confrontation clause violation, albeit for different reasons, we may not do so either.  Dr. Lawrence's reliance on portions of someone else's autopsy report in forming his opinions did not violate defendant's right to confront the witnesses against him.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**

8

**DISSENTING OPINION BY CORRIGAN, J.**


I respectfully dissent.  I would hold that Dr. George Bolduc's autopsy report was sufficiently formal and primarily made for an evidentiary purpose, as the United States Supreme Court has explicated those terms to date.  Dr. Bolduc's report contained anatomical observations about which another forensic pathologist testified.  High court authority compels the conclusion that admitting this testimony violated defendant's confrontation rights.

Dr. Bolduc performed an autopsy on Lucinda Pina and prepared an autopsy report with accompanying photographs.  We have taken judicial notice of that report, which is not certified.  The prosecution did not call Dr. Bolduc as a witness, presenting instead Dr. Robert Lawrence.  The prosecution did not indicate that Dr. Bolduc was unavailable, and defendant objected to the witness substitution.  Defense counsel's hearsay objection to Dr. Lawrence's testimony was overruled.

Dr. Lawrence told the jury that he relied on Dr. Bolduc's autopsy report and accompanying photographs as a basis for his testimony.  Neither the report nor photographs were admitted in evidence.  Although he had not been present during the procedure, Dr. Lawrence testified about the condition of Pina's body at the time of the autopsy.  These statements about the body's condition were presented as facts, about which Dr. Lawrence had no personal knowledge.

1

Whether Dr. Lawrence's testimony violated defendant's Sixth Amendment right to confrontation turns on whether Dr. Lawrence related testimonial hearsay. In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the Supreme Court established that it is the "testimonial" nature of a statement that gives rise to Sixth Amendment protections.[1] The Supreme Court has yet to clearly define just what the term "testimonial" means.

Nevertheless, I agree with the majority that the Supreme Court's *Crawford* jurisprudence reflects the importance of two factors in determining whether a statement is testimonial: (1) the degree of formality or solemnity of the statement and (2) the primary purpose for which the statement is made.

Applying those two factors, I conclude the anatomical observations contained in Dr. Bolduc's autopsy report were testimonial statements. The prosecution asked Dr. Lawrence to relate facts about the condition of Pina's body. To the extent those facts were drawn from Dr. Bolduc's report, as opposed to observations based on the autopsy photographs, Dr. Lawrence related testimonial hearsay in violation of defendant's federal constitutional right to confront and cross-examine Dr. Bolduc.

Although the majority notes that Dr. Lawrence also relied on autopsy photographs for his testimony, the record is insufficient to establish that the photographs provided an independent basis for Dr. Lawrence's testimony.

A. *Dr. Bolduc's Recorded Observations Were Sufficiently Formal*

In *Crawford*, the Supreme Court made clear that "not all hearsay implicates the Sixth Amendment's core concerns." (*Crawford*, *supra*, 541 U.S. at p. 51.) The court observed that core testimonial statements covered by the confrontation

_____

[1] The circumstances surrounding the prosecution's decision to call Dr. Lawrence, rather than presenting Dr. Bolduc and subjecting him to cross-examination, certainly raise concerns.

2

clause include " '*ex parte* in-court testimony or its functional equivalent,' " using an affidavit as an example. (*Crawford*, at p. 51.)

Applying the *Crawford* analysis to forensic evidence, the United States Supreme Court has determined that affidavits reporting results of forensic analysis are sufficiently formal (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310-311) (*Melendez-Diaz*), as are unsworn certificates (*Bullcoming v. New Mexico* (2011) 564 U.S. __, __ [131 S.Ct. 2705, 2717]) (*Bullcoming*). In *Melendez-Diaz*, a Massachusetts statute allowed state crime laboratory technicians to record their test results in a sworn affidavit. Under the statute, these affidavits were admitted to prove the test results. The technicians did not testify and thus were not subject to cross-examination. (See *Melendez-Diaz*, at pp. 308-309.) Similarly in *Bullcoming,* New Mexico applied municipal and magistrate court rules that allowed certified reports into evidence without a technician's testimony. (See *Bullcoming*, *supra*, at p. __ [131 S.Ct. at p. 2717].) These state-created procedures were quite similar, in some respects, to the ex parte procedure of the Marian statutes, which the *Crawford* court observed was the "principal evil at which the Confrontation Clause was directed." (*Crawford*, *supra*, 541 U.S. at p. 50.)

However, whether *uncertified* reports are sufficiently formal to be considered testimonial remains an open question. In *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221] (*Williams*), the high court considered statements made in an uncertified Cellmark laboratory report, relied upon by an expert witness for her testimony. The report was not introduced into evidence. (*Id*. at p. __ [132 S.Ct. at p. 2235].) Before considering whether the Cellmark report amounted to testimonial hearsay, the plurality opined that the report was not hearsay at all because its contents were not admitted for their truth. (*Williams*,

3

*supra*, at p. __ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).)[2]  This conclusion did not garner a majority.  Five justices explicitly repudiated that analysis.  (See *Williams*, at pp. __-__ [132 S.Ct. at pp. 2256-2259] (conc. opn. of Thomas, J.); *id.* at pp. __-__ [132 S.Ct. at pp. 2268-2272] (dis. opn. of Kagan, J.).)[3]

The *Williams* plurality offered an alternative analysis as well.  Even if the Cellmark report had been introduced for its truth, the report failed to satisfy the plurality's formulation of primary purpose.  (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).)  The primary purpose test is discussed below.  What is important to note here is that, in offering its alternative analysis, the plurality did not discuss whether the Cellmark report was sufficiently formal.

Justice Thomas provided the dispositive fifth vote in *Williams*.  He did so only because the Cellmark report "lacked the requisite 'formality and solemnity' to be considered ' "testimonial." ' "  (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.).)  In joining the plurality's outcome, Justice

---

[2]  See Evidence Code section 1200, subdivision (a), which provides that " '[h]earsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."

[3]  Two points are important here.  There are, of course, many instances in which out-of-court statements are not offered for their truth.  The longstanding rule that unless a statement is admitted for its truth it is not hearsay remains unchanged.  The question is whether a statement *is* admitted for its truth.  When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in *Williams*, *supra*, 567 U.S. __ [132 S.Ct. 2221], rejects the premise that the out-of-court statement is not admitted for its truth.

Second, it should be noted that *Crawford* and its progeny are grounded squarely in the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  Thus, the *Crawford* limitations do not apply in civil cases nor do they apply when evidence is not offered *against* a criminal defendant.

Thomas emphasized his strict position "that the Confrontation Clause reaches ' "formalized testimonial materials," ' such as depositions, affidavits, and prior testimony, or statements resulting from ' "formalized dialogue," ' such as custodial interrogation." (*Id*. at p. __ [132 S.Ct. at p. 2260].) Justice Thomas has articulated this position in *Davis v. Washington* (2006) 547 U.S. 813, 836-837 (dis. opn. of Thomas, J.) (*Davis*); *Melendez-Diaz*, *supra*, 557 U.S. at page 329; and *Michigan v. Bryant* (2011) 562 U.S. __, __ [131 S.Ct. 1143, 1165] (conc. opn. of Thomas, J.) (*Bryant*). Under Justice Thomas's interpretation, "although the [Cellmark] report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Williams*, *supra*, at p. __ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).)

Justice Kagan, writing for the dissenters, expressly rejected Justice Thomas's formality analysis. Comparing the Cellmark report to the unsworn report in *Bullcoming*, *supra*, 564 U.S. __ [131 S.Ct. 2705], Justice Kagan stated: the differences "amount[] to (maybe) a nickel's worth of difference: The similarities in form, function, and purpose dwarf the distinctions. [Citation.] Each report is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings. Neither looks any more 'formal' than the other; neither *is* any more formal than the other. . . . The difference in labeling —a 'certificate' in one case, a 'report of laboratory examination' in the other—is not of constitutional dimension." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.).)

So the question remains: For purposes of the Sixth Amendment confrontation clause, can a statement in an uncertified document be formal enough to qualify as testimonial? In the absence of any Supreme Court majority definitively answering this question, we must do so. We answer it in light of the entire *Crawford* jurisprudence and our own application of it.

The *Crawford* court explained that testimony "*is typically* '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Crawford*, *supra*, 541 U.S. at p. 51, italics added.) "Various formulations of this core class of 'testimonial' statements exist: *ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Crawford*, *supra*, 541 U.S. at pp. 51–52.)

But the high court emphasized that "[s]tatements taken by police officers in the course of interrogations are also testimonial *under even a narrow standard*." (*Crawford*, *supra*, 541 U.S. at p. 52, italics added.) "The statements are not *sworn* testimony, but the absence of oath was not dispositive." (*Ibid*.)

In *Davis*, *supra*, 547 U.S. 813, the court again emphasized that testimonial hearsay is not limited to "the most formal sort — sworn testimony in prior judicial proceedings or formal depositions under oath . . . ." (*Id*. at p. 826.) "[W]e do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." (*Davis,* at p. 826.) "The product of [police] interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial." (*Ibid*.) The court noted that "[t]he solemnity of even an oral declaration of relevant past fact to an investigating officer is well

6

enough established by the severe consequences that can attend a deliberate falsehood. [Citations.]" (*Ibid*.)

*Davis*, *supra*, 547 U.S. 813, involved two consolidated cases in which domestic violence victims made statements to government authorities. In one of those cases, *Hammon v. Indiana*, police responded to a domestic violence report and came upon the defendant's wife standing outside her house. Although frightened, she told the officers that " ' "nothing was the matter." ' " (*Davis*, at p. 819.) The officers eventually interviewed her inside the home, keeping her separated from her husband in another room. She wrote and signed a " 'battery affidavit,' " summarizing an assault. (*Id*. at p. 820.) When the wife failed to appear at her husband's trial, her oral and written statements were admitted through the police officer who had questioned her. (*Davis*, at pp. 820-821.)

The Supreme Court concluded the statements were "formal enough" to qualify as testimonial because of the circumstances surrounding the interrogation. (*Davis*, *supra*, 547 U.S. at p. 830.) The statements were made during organized and structured questioning in a separate room; inquiry focused on past events that were potentially criminal; and the officer received the wife's replies for use in the investigation. (*Ibid*.) "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Ibid*.)

The other case decided in *Davis* concerned statements made by a domestic violence victim to a 911 operator. In concluding that these statements were not sufficiently formal, the court contrasted them with *Crawford*'s police station interrogation: "Crawford was responding calmly, at the station house, to a series

7

of questions, with the officer-interrogator taping and making notes of her answers; [the *Davis* victim's] frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Davis, supra,* 547 U.S. at p. 827.)

In *People v. Cage* (2007) 40 Cal.4th 965, this court applied *Davis* to determine whether a victim's hearsay statements to a sheriff's deputy were testimonial. We explained that *Davis* demonstrates that "though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, *to some degree*, the formality and solemnity characteristic of testimony." (*Cage*, at p. 984, italics added.) In *Cage,* a sheriff's deputy interviewed an assault victim at a hospital emergency room, more than an hour after the assault. (*Id.* at p. 985.) The circumstances of the interview "were relatively informal, but they were no less formal or structured than the residential interview of Amy Hammon in *Davis*. Here, as there, the requisite solemnity was imparted by the potentially criminal consequences of lying to a peace officer." (*Cage*, at p. 986, fn. omitted.)

In *Bryant*, *supra*, 562 U.S. __ [131 S.Ct. 1143], police came upon a man lying in a parking lot, bleeding from gunshot wounds. The Supreme Court majority concluded his statements identifying his shooter were not testimonial because their primary purpose was to enable police to respond to an ongoing emergency. (*Id.* at pp. __-__ [131 S.Ct. at pp. 1163-1167].) Addressing the issue of formality, the court noted that questioning occurred in an exposed, public area, in a disorganized fashion, before emergency medical services arrived. Thus, the circumstances were factually distinguishable from a formal station house interrogation. The court cautioned that "informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." The *Bryant* majority referred to *Davis*'s explanation that attempting to keep a written

8

interrogation "informal" by not asking the declarant to sign it will not serve to evade confrontation clause protections. (*Bryant*, *supra*, at p. __ [131 S.Ct. at p. 1160], citing *Davis*, *supra*, 547 U.S. at p. 826.)

In *Bullcoming, supra*, 564 U.S. __ [131 S.Ct. 2705], the high court refused to distinguish between the unsworn laboratory certificate before it and the affidavits offered in *Melendez-Diaz.* The court noted *Crawford*'s observation that the absence of an oath is not controlling when determining whether a statement is testimonial. (*Bullcoming*, *supra*, at p. __ [131 S.Ct. at p. 2717].) The court pointed out that the analyst's certificate was " 'formalized' in a signed document, [citation], headed a 'report.' " The report form contained a legend referring to the applicable court rules permitting admission of certified blood-alcohol analyses. "In sum, the formalities attending the 'report of blood alcohol analysis' are *more than adequate* to qualify [the analyst's] assertions as testimonial." (*Ibid*., italics added.)

With this background in mind, we turn to the autopsy report prepared by Dr. Bolduc. During the autopsy, he examined Pina's body and ultimately included his observations as to her physical condition in his written report. At trial, Dr. Lawrence gave his opinion that Pina died by strangulation. In explaining that conclusion, he related, as matters of fact, Dr. Bolduc's observations of Pina's body as they were set out in the autopsy report. In particular, Dr. Lawrence mentioned the hemorrhages in Pina's eyes and neck, the purple color of her face, the absence of any natural disease causing death, the fact that she had bitten her tongue shortly before death, and the absence of any fractures in the larynx and hyoid bone. As to the latter, Dr. Bolduc wrote: "There are no fractures of the hyoid bone, thyroid or cricoid cartilages."

The majority states: "An autopsy report typically contains two types of statements: (1) statements describing the pathologist's anatomical and

9

physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death. The out-of-court statements at issue here — pathologist Bolduc's observations about the condition of victim Pina's body — all fall into the first of the two categories. These statements, which merely record objective facts, are less formal than statements setting forth a pathologist's expert conclusions. They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such notations are not testimonial in nature." (Maj. opn., *ante*, at p. 12.)[4]

The majority creates a distinction between two kinds of statements in the autopsy report: observations and conclusions. The majority appears to suggest that while conclusions may be formal, observations are not. There are several problems with this analysis. First, it conflates the two prongs of the testimonial determination: formality and primary purpose. The formality prong looks to the circumstances under which the statement is made and any efforts to enhance the statement's formality by having it sworn (*Melendez-Diaz*, *supra*, 557 U.S. 305), certified (*Bullcoming*, *supra*, 564 U.S. __ [131 S.Ct. 2705]), or signed (*Davis*, *supra*, 547 U.S. 813). The formality prong turns on the circumstances of the statement's production and preservation rather than its content.[5]

---

[4] Of course there are several ways in which the statements are not comparable. An autopsy report reflects the examination of a dead body rather than a live patient. The autopsy surgeon is conducting an official inquiry, while a physician is treating his or her patient, not assisting in a governmental investigation.

[5] The high court made clear that the *content* of a statement may be quite important in determining the *primary purpose* for which it is made. (See, e.g., *Bryant*, *supra*, 562 U.S. at pp. __-__ [131 S.Ct. at pp. 1160-1161, 1165-1166].)

10

Second, the distinction the majority offers here was rejected in *Bullcoming*, *supra*, 564 U.S. __ [131 S.Ct. 2705]. Justice Ginsburg, joined by four other justices on this point, wrote: "Most witnesses, after all, testify to their observations of factual conditions or events, *e.g.,* 'the light was green,' 'the hour was noon.' Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact—Bullcoming's counsel posited the address above the front door of a house or the read-out of a radar gun. [Citation.] Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically 'No.' " (*Id.* at pp. __-__ [131 S.Ct. at pp. 2714-2715].)

Further, the *Bullcoming* majority noted that while "[t]he New Mexico Supreme Court stated that the number registered by the gas chromatograph machine called for no interpretation or exercise of independent judgment on [the analyst's] part," the "analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.' " (*Bullcoming*, *supra*, 564 U.S. at p. __ [131 S.Ct. at p. 2715].)

We are not called upon in this matter to determine whether every aspect of the autopsy report was testimonial. The question here is whether anatomical observations Dr. Bolduc made are sufficiently formal in light of the circumstances in which they were made and the document in which they were recorded. In many cases, Government Code section 27491.4, subdivision (a) gives a coroner discretion whether to conduct an autopsy. Once that discretion is exercised, the statute requires: "The detailed medical findings resulting from an inspection of the body or autopsy by an examining physician shall be either reduced to writing or

11

permanently preserved on recording discs or other similar recording media, shall include all positive and negative findings pertinent to establishing the cause of death in accordance with medicolegal practice and this, along with the written opinions and conclusions of the examining physician, shall be included in the coroner's record of the death."  (Gov. Code, § 27491.4, subd. (a).)

Dr. Bolduc performed this autopsy and prepared a report in compliance with Government Code section 27491.4, subdivision (a).  He was working for the Sheriff-Coroner of San Joaquin County, and the report is identified as a document filed with the San Joaquin County Sheriff-Coroner's Office.  An autopsy report is a public record.  (See *Dixon v. Superior Court* (2009) 170 Cal.App.4th 1271, 1278.)

Dr. Bolduc's autopsy report consists of seven pages.  The top of the first page bears the preprinted notation "Office of Sheriff-Coroner, County of San Joaquin."  That same page contains a reproduction of the badge of the San Joaquin County Sheriff, below which is the name "Robert Heidelbach, Sheriff-Coroner, Public Administrator."

Additionally, the first page of the autopsy report identifies the document as "Coroner's Autopsy Report."  In the upper right-hand corner of each subsequent page is the identification "Coroner's Autopsy Report."  Dr. Bolduc's name is printed on the bottom of each page.

The report provides a detailed summary of the external examination of the victim, concluding with "Findings Consistent With Neck Compression."  The report then provides a detailed summary of the internal examination, including the description of the injuries to the neck and the absences of fractures "of the hyoid bone, thyroid or cricoid cartilages."

The report concludes with nine "Autopsy Findings."  The first "finding" states:  "The autopsy findings are consistent with neck compression for the

12

following reasons," and list six reasons. The report states, "Cause of Death: Asphyxia (minutes) [*sic*]; Due to: Neck compression." The report is signed by "George E. Bolduc, M.D.," and dated June 8, 2006.

In terms of formality, Dr. Bolduc's autopsy report comports closely with the court's description of "testimonial" in *Bullcoming*, *supra*, 564 U.S. __ [131 S.Ct. 2705]. There, the analyst's certificate, although unsworn, was " 'formalized' in a signed document, [citation], headed a 'report,' " and these attendant formalities were found "more than adequate to qualify [the analyst's] assertions as testimonial." (*Id*. at p. __ [131 S.Ct. at p. 2717].) Although Dr. Bolduc's "Coroner's Autopsy Report," is not certified, it is signed and dated. It is manifestly an official report, prepared by Dr. Bolduc as an agent of the Sheriff-Coroner and in compliance with the Government Code. I believe the document and the circumstances of its preparation reveal that the statements at issue here are sufficiently formal to satisfy that prong of the Supreme Court's testimonial test.

B. *Dr. Bolduc's Recorded Observations Satisfy the Primary Purpose Test*

In *Williams*, *supra*, 567 U.S. __ [132 S.Ct. 2221], all members of the Supreme Court agreed that the primary purpose for which a statement is made is an important prong of the testimonial test. Beginning with *Crawford*, *supra*, 541 U.S. 36, the high court has declined to provide a firm definition of "testimonial." In *Williams*, three different formulations were given.

Justice Alito, for the plurality, wrote that even if the Cellmark report had been introduced for its truth, it was not testimonial because it was not prepared for "the primary purpose of accusing a targeted individual." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) This formulation garnered a total of four votes, as Justice Alito was joined by Chief Justice Roberts and Justices Kennedy and Breyer. (*Id*. at p. __ [132 S.Ct. at p. 2227].). Under the

13

plurality's definition, a statement is not testimonial unless it was made to accuse a specific person.

Justice Thomas rejected that definition. He agreed that for a statement to qualify as testimonial, it must be made with a requisite primary purpose, which he described thusly: "[F]or a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).)[6] He criticized the accusatory statement concept newly formulated by the plurality because it "lacks any grounding in constitutional text, in history, or in logic." (*Williams*, at p. __ [132 S.Ct. at p. 2262].)

Justice Kagan, in a dissent joined by Justices Scalia, Ginsburg, and Sotomayor, also rejected the plurality's definition of the primary purpose test. Justice Kagan wrote, "Where that test comes from is anyone's guess. Justice Thomas rightly shows that it derives neither from the text nor from the history of the Confrontation Clause. [Citation.] And it has no basis in our precedents. We have previously asked whether a statement was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence. *Davis*, 547 U.S., at 822, 126 S.Ct. 2266; see also *Bullcoming*, 564 U.S., at __, 131 S.Ct., at 2705; *Bryant*, 562 U.S., at ___,___, 131 S.Ct. 1143, at p. 1157; *Melendez-Diaz*, 557 U.S., at 310-311, 129 S.Ct. 2527; *Crawford*, 541 U.S., at 51-52, 124 S.Ct. 1354. None of our cases has ever suggested that, in addition, the statement must be meant to accuse a

---

**6** Justice Thomas cautioned that such a test must be coupled with the solemnity requirement. Otherwise "it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity and is thus 'disconnected from history.' " (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).)

14

previously identified individual; indeed, in *Melendez–Diaz,* we rejected a related argument that laboratory 'analysts are not subject to confrontation because they are not "accusatory" witnesses.' 557 U.S., at 313, 129 S.Ct. 2527." (*Williams*, *supra*, 567 U.S. at pp. __-__ [132 S.Ct. at pp. 2273-2274] (dis. opn. of Kagan, J.).)

In *Williams*, *supra*, 567 U.S. __ [132 S.Ct. 2221], the high court failed to articulate any reasoning accepted by a majority of that court. " 'When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . ." ' (*Marks v. United States* (1977) 430 U.S. 188, 193.)" (*Del Monte v. Wilson* (1992) 1 Cal.4th 1009, 1023.) "This rule only works in instances where 'one opinion can meaningfully be regarded as "narrower" than another — only when one opinion is a logical subset of other, broader opinions,' *King v. Palmer,* . . . 950 F.2d 771, 781 (D.C.Cir. 1991) (en banc), that is to say, only when that narrow opinion is the common denominator representing the position approved by at least five justices. When it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court. [Citation.] [¶] . . . The only binding aspect of such a splintered decision is its specific result . . . ." (*U.S. v. Alcan Aluminum Corp.* (2d Cir. 2003) 315 F.3d 179, 189.)

As Justice Kagan wrote in *Williams*, *supra*, 567 U.S. __ [132 S.Ct. 2221], " . . . I call Justice Alito's opinion 'the plurality,' because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication." (*Id.* at p. __ [132 S.Ct. at p. 2265] (dis. opn. of Kagan, J.).)

Because the high court failed to articulate any reasoning carrying a majority of that court, *Williams* provides no authoritative reasoning for us to follow. Nevertheless, despite the fractured voting, *Williams* represents the first time that all nine justices agree that primary purpose is a significant part of the "testimonial" analysis. So how do we determine whether the "primary purpose" for which a statement was given satisfies that prong of the testimonial test?

We must apply the high court's binding decisions in this area. The four dissenting justices in *Williams* continue to adhere to the primary purpose test articulated in *Davis, supra*, 547 U.S. 813. (See *Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2274] (dis. opn. of Kagan, J.).) As set out above, *ante* at page 5, Justice Thomas provides a definition slightly different from that endorsed by the dissenters. While future developments may clarify whether those differences result in a legally significant distinction, the similarity between the two formulations is sufficient to consider them together here.

The primary purpose test of *Davis* was again applied by the Supreme Court majority in *Bryant*, *supra*, 562 U.S. __ [131 S.Ct. 1143]. The court further explained that "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.' The circumstances in which an encounter occurs . . . are clearly matters of objective fact." (*Bryant*, *supra*, at p. __ [131 S.Ct. at p. 1156].)[7]

---

[7]    In *Bullcoming*, *supra,* 564 U.S. __ [131 S.Ct. 2705], Justice Ginsburg, writing for the majority, included this footnote: "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.' " (*Id*. at p. __ [131 S. Ct. at p. 2714, fn. 6], quoting *Davis*, *supra*, 547 U.S. at p. 822.) Justice Thomas, a member of the majority, did not join in the footnote.

16

In view of the binding precedent of the high court, I suggest the appropriate inquiry is whether, viewed objectively, a sufficiently formal statement was made for the primary purpose of establishing or proving past facts for possible use in a criminal trial.

Turning to Dr. Bolduc's autopsy, the majority states: "The usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigations and prosecution; such reports serve many other equally important purposes." (Maj. opn., *ante*, at p. 14.)

Such a blanket approach is not supported by controlling precedent. While some autopsies may be conducted for purposes unrelated to a criminal prosecution, other autopsies conducted under different circumstances may well result in the production of testimonial statements. In *Bryant*, *supra*, 562 U.S. __ [131 S.Ct. 1143], Justice Sotomayor, writing for the majority, notes that the primary purpose for which a statement is made will often be highly fact dependent.[8] Indeed, the primary purpose may change as events evolve. The *Bryant* court, citing *Davis*, *supra*, 547 U.S. at page 828, pointed out that a conversation initially concerning the need for emergency assistance may evolve to produce testimonial statements.[9] Further, a statement may be made or recorded

---

[8] For example, the majority noted, "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." (*Bryant, supra*, 562 U.S. at p. __ [131 S.Ct. at p. 1158].) "In determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances." (*Id*. at p. __ [131 S.Ct. at p. 1162].)

[9] As the majority explained in *Bryant*: "This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis,* flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial, as they do,

17

for multiple purposes. (See *Bryant, supra*, at p. __ [131 S.Ct. at p. 1161].) However, it is the *primary* purpose that must be determined and that determination will drive the analysis.

Thus, the question is whether *this* autopsy report was made for the primary purpose of establishing past facts for possible use in a criminal trial. Answering that question, "we objectively evaluate the circumstances" in which the report was generated. (*Bryant*, *supra*, 562 U.S. at p. __ [131 S.Ct. at p. 1156].)

An objective consideration of this autopsy report reveals the following. Dr. Bolduc's autopsy of Pina's body took place over two days during a homicide investigation. There is no dispute that the victim, whose body was discovered in her parked car after a police search, was a homicide victim. The report reveals that homicide detective Robert Faine was present throughout the autopsy. It indicates that, at various times during the second day of the procedure, another police officer, an evidence technician, and a Department of Justice representative were also present. Faine testified at the preliminary hearing that he told Dr. Bolduc about the position and appearance of Pina's body in the car. Dr. Bolduc's autopsy report relates: "This woman, dressed in pajamas and socks, was found on the rear floorboard of her SUV covered by a blanket. The windows were closed and the doors were locked." The report also notes: "History from police Detective Faine that someone confessed to manually strangling the deceased from the front and putting the body in her SUV and driving around for a while." In light of all these circumstances, I conclude that when Dr. Bolduc wrote this

---

for example, with unduly prejudicial portions of otherwise admissible evidence.' " (*Bryant*, *supra*, 562 U.S. at pp. __-__ [131 S.Ct at pp. 1159-1160, fn. omitted].)

18

autopsy report, his primary purpose was to make the statements at issue to establish facts for possible use in a criminal trial.**10**

While Justice Werdegar joins the majority opinion, she writes separately to explain in more detail why Dr. Bolduc's statements are not testimonial. The explanation offered is problematic.

First, on the issue of formality, the concurrence relies on standards attributed to the National Association of Medical Examiners (NAME Standards). Those standards appear nowhere in the record. The trial court did not rely on them. No statute mentions them. We cannot determine from this record whether those standards are widely accepted in California. We have no basis to conclude those standards are implicated in this case.

On the primary purpose question, the concurrence asserts there is a "consensus" that a statement is more testimonial "to the extent it was produced under circumstances making it likely to be used in place of live testimony at a future criminal trial." (Conc. opn. of Werdegar, J., *ante*, at p. 5.) It is inaccurate to say there is a consensus among the justices as to the definition of "primary purpose." The definition has been formulated variously in *Crawford* and subsequent cases. As noted, three different formulations are contained in the *Williams* opinion alone.

The precise phrasing of the test is important, even if the high court has yet to agree upon one. Articulating the test in different ways gives rise to confusion. I

---

**10** I note that because defendant had already confessed to strangling Pina at the time Dr. Bolduc prepared his autopsy report, the primary purpose formulation embraced by the *Williams* plurality is also satisfied. The autopsy statements were made for the primary purpose of accusing a targeted individual, the confessing defendant. (See *Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2242] (plur. opn. of Alito, J.).)

19

suggest it is unwise for us to try and synthesize the court's many formulations to urge there is a consensus, where plainly one does not exist.

The concurrence again places heavy reliance on the NAME Standards to conclude that a medical examiner may make a " 'neutral and objective medical assessment,' " when doing an autopsy. (Conc. opn. of Werdegar, J., *ante*, at p. 6.) Regardless of how an association may characterize what some medical examiners may generally do, the question before us is what *this* doctor did, and for what primary purpose he wrote *this* autopsy report. There is no evidence in this record that Dr. Bolduc followed the NAME Standards, or relied on them in any way. As explained in the majority opinion (*ante*, at pp. 3-4) the pretrial evidentiary hearing contains assertions that Dr. Bolduc was fired as a coroner in Kern County, did not reveal that fact in his resume, and resigned his coroner's position in Orange County " 'under a cloud.' " Dr. Lawrence acknowledged at that hearing that prosecutors in several counties refused to use him as an expert witness.

The concurrence's statement that there is no indication that Dr. Bolduc "was guided in his conduct and documentation of the autopsy by anything other than professional medical practices and standards" (conc. opn. of Werdegar, J., *ante*, at p. 9) rests on complete speculation. Indeed, it is precisely those questions that could have been pursued during his cross-examination had the prosecution not declined to call Dr. Bolduc as a witness.

C. *Prejudicial Effect of the Error*

The majority notes that Dr. Lawrence did not say whether his description of Pina's body at the time of the autopsy was based solely on the autopsy photographs, solely on Dr. Bolduc's autopsy report, or on a combination of the two. (Maj. opn., *ante*, at p. 5.) The existence of multiple sources is important.

Autopsy *photographs* are not hearsay. Hearsay is an out-of-court "statement." (See Evid. Code, § 1200.) Evidence Code section 225 defines

20

"statement" as oral or written *verbal* expression or nonverbal conduct of a person. Only people can generate hearsay. Machines, animals, chemical reactions cannot. (See Simons, Cal. Evidence Manual (2012 ed.) §2.2, pp. 74-75.) Therefore, to the extent Dr. Lawrence had used properly authenticated autopsy photographs to explain his testimony, he would not have disclosed testimonial hearsay.[11]

On this record, supplemented by our review of the judicially noticed autopsy record, it cannot be determined if the autopsy photographs would have independently supported Dr. Lawrence's testimony. The photographs were not admitted in evidence, and Dr. Bolduc's report did not mention them other than to note that "[m]ultiple photographs are taken." Defendant objected to Dr. Lawrence's testimony as hearsay. It was the prosecution's burden, as proponent of the challenged evidence, to establish its admissibility. (See Pen. Code, § 1096.) It failed to do so.

When the erroneous admission of evidence against a criminal defendant violates a right under the federal Constitution, the judgment must be reversed unless the prosecution shows beyond a reasonable doubt that the result would have been the same notwithstanding the error. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Applying that test here, I conclude that the erroneously admitted testimony of Dr. Lawrence was prejudicial.

As the Court of Appeal explained, Dr. Lawrence's opinion that Pina was strangled for at least two minutes was a crucial part of the prosecution's case: "While defendant admitted strangling Pina to death, he said he did so only after he was provoked to the point of losing control and argued he was guilty of at most voluntary manslaughter. The prosecution's argument that defendant was guilty of intentional murder, and not voluntary manslaughter, was based in large part on the

---

[11]     I assume Detective Faine, who attended the autopsy, could have authenticated the autopsy photographs.

theory that during the time it took for defendant to strangle Pina, what may have begun as passion shaded into intent.  The only evidence offered by the prosecution in support of this theory was Dr. Lawrence's testimony that Pina was strangled for at least two minutes before she died, which he based on Dr. Bolduc's report.  The prosecutor relied on that testimony during her closing argument in arguing defendant was guilty of murder and not voluntary manslaughter."

Dr. Lawrence description of Pina's body, drawn from the hearsay contained in Dr. Bolduc's autopsy report, violated defendant's right to confront and cross-examine Dr. Bolduc.  Had the trial court excluded that description, there would have been no evidence supporting Dr. Lawrence's opinion regarding the length of Pina's strangulation.[12]  Without such evidence, the jury might have rejected the prosecutor's argument (maj. opn., *ante*, at p. 6) that defendant could not have killed Pina in the heat of passion because any such passion would have dissipated during the two minutes it took to strangle her.

I would affirm the judgment of the Court of Appeal.

In reaching this conclusion I note that various Supreme Court justices have written at length describing how the court's *Crawford* jurisprudence has created serious and complicated problems, the full significance of which continues to evolve.[13]  As Justice Alito observed in *Williams*, "Experience might yet show that

---

[12]     Dr. Lawrence might have testified that he could base his opinion on nonhearsay photographs.  He did not.  Had he done so, his claims that the photographs were sufficient for that purpose would have been subject to cross-examination as well as being potentially rebuttable by independent defense evidence to the contrary.

[13]     See, for example, the concurring opinion of Chief Justice Rehnquist, joined by Justice O'Connor in *Crawford*, *supra*, 541 U.S. at pages 69-76; the dissenting opinion of Justice Kennedy, joined by Chief Justice Roberts, and Justices Breyer and Alito, in *Melendez-Diaz*, *supra*, 557 U.S. at pages 330-357; and the concurring opinion of Justice Breyer in *Williams*, *supra*, 567 U.S. at pages __-__ [132 S.Ct. at pages 2244-2255].

the holdings [in *Crawford*'s progeny] should be reconsidered for the reasons, among others, expressed in the dissents the decisions produced." (*Williams*, *supra*, 567 U.S. at p. __, fn. 13 [132 S.Ct. at p. 2242, fn. 13] (plur. opn. of Alito, J.).)

Application of Supreme Court precedent is further complicated by the fact that the tests propounded are expressed in various formulations and are modified in ensuing opinions with shifting levels of agreement among the justices. As Justice Breyer pointed out in his *Williams* concurrence: "Answering the underlying general question . . . , and doing so soon, is important. Trial judges in both federal and state courts apply and interpret hearsay rules as part of their daily trial work. . . . Obviously, judges, prosecutors, and defense lawyers have to know, in as definitive a form as possible, what the Constitution requires so that they can try their cases accordingly. [¶] The several different opinions filed today embody several serious, but different, approaches to the difficult general question. Yet none fully deals with the underlying question as to how, after *Crawford*, Confrontation Clause 'testimonial statement' requirements apply . . . ." (*Williams*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2248] (conc. opn. of Breyer, J.).) The problem is reflected in the various opinions our court offers here.

23

Nevertheless, a majority of the Supreme Court has propounded a series of rules founded squarely on a federal constitutional guarantee.  Lower courts must conscientiously apply those constitutionally mandated principles, as best we can discern them, whether or not we agree with their wisdom or their logic.

**CORRIGAN, J.**

**I CONCUR:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Dungo
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 176 Cal.App.4th 1388
**Rehearing Granted**

_____

**Opinion No.** S176886
**Date Filed:** October 15, 2012
_____

**Court:** Superior
**County:** San Joaquin
**Judge:** Charlotte J. Orcutt

_____

**Counsel:**

Ann Hopkins, under appointment by the Supreme Court, for Defendant and Appellant.

Bartell & Hensel, Donald J. Bartell, Lara J. Gressley; and John N. Aquilina for California DUI Lawyers Association and California Attorneys for Criminal Justice as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Daniel E. Bernstein, Deputy Attorneys General; James P. Willett, District Attorney, Edward J. Busuttil, Assistant District Attorney, and Ronald J. Freitas, Deputy District Attorney, for Plaintiff and Respondent.

W. Scott Thorpe; and Albert C. Locher, Assistant District Attorney (Sacramento) for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Dolores A. Carr, District Attorney (San Jose) and John Chase, Deputy District Attorney, for California Association of Crime Laboratory Directors as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Ann Hopkins
P.O. Box 23711
Oakland, CA  94623
(510) 530-8774

Ronald J. Freitas
Deputy District Attorney
222 East Weber, Room 202
Stockton, CA  95202
(209) 468-2400